UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
                                                    )
**UNITED STATES OF AMERICA** *ex rel*  )
**STEPHANIE SCHWEIZER,** *et al.*,     )
    Plaintiffs,                 )
                                                    )    Civil Action No. 06-648 (RCL)
    v.                           )
                                                    )
**OCE NORTH AMERICA, INC.,** *et al.*, )
    Defendants.                  )
                                                    )
_____)

## **MEMORANDUM OPINION**

Before the Court is defendants Océ North America, Inc., Océ-USA Holding, Inc., Océ Imagistics, Inc., and Océ N.V.'s Motion for Summary Judgment. Upon consideration of the Motion, the Opposition thereto, the Reply brief, applicable law, and the entire record, the Court will grant the Motion for the reasons that follow.

**I.    BACKGROUND**

Defendant Océ North America, Inc. ("Océ") hired plaintiff Stephanie Schweizer in December 2004 as GSA Contracts Manager. Schweizer Dep. 131–34, July 21, 2010, ECF No. 103-4. Schweizer managed Océ's Schedule 30 and 76 contracts with the U.S. General Services Administration (GSA), which obligated Océ to supply printers and related products to the federal government. Beauchamp Dep. 14, Aug. 3, 2010, EFC No. 103-8. Schweizer was responsible for "daily management and oversight" to "maintain[] the integrity of all contracts" and "assure contract compliance." Ex. 2 to Frost Dep. at 2, Aug. 5, 2005, ECF No. 105-1 [hereinafter Job Description]; Beauchamp Dep. 13–14. Her specific duties included being a point of contact for salespersons, Schweizer Dep. 131, 150–51, and for government officials, Job Description at 7,

1

negotiating contract modifications, *id.* at 1, setting up and managing the GSA Advantage Program (the government electronic buy board), *id.*, supporting the field sales effort by—among other things—developing price strategy, *id.* at 2, ensuring accuracy of product specifications and prices listed in the contracts, Schweizer Dep. 150–51, understanding government contract law and keeping abreast of new legislation, Job Description at 2, participating in the Coalition for Government Procurement and other similar associations, *id.*, coordinating with senior management on GSA and related matters to assure contract compliance, *id.*, and ensuring general legal and contractual compliance, Schweizer Dep. 131, 171–72.

Schweizer reported directly to Ronald Frost, Océ's Director of Government Contracting. Frost Dep. 9. On occasion, Frost's supervisor and Océ's Vice President of Business Development and Federal Sales, Bryan Beauchamp, assigned work to Schweizer directly. *E.g.,* Schweizer Decl. ¶ 7, Sept. 20, 2010, ECF No. 105-5.

While performing her job, Schweizer began to suspect that Océ was defrauding the federal government by deliberately failing to negotiate GSA contract modifications to reflect commercial price discounts, in violation of the contracts' price reduction clauses, and by deliberately certifying that some products were manufactured in the Netherlands despite actually being manufactured in China, in violation of the Trade Agreements Act, to which the Schedule 36 and 70 contracts were subject. Schweizer Decl. ¶¶ 4, 5, 7, 8.

Schweizer's suspicions regarding price reduction clause noncompliance developed from her monitoring the GSA Advantage Program and communicating about prices with coworkers, including Accounts Managers Nancy Vee and Sue Wohlford, and with her supervisor, Frost. *Id.* ¶¶ 3-6. Vee told Schweizer that she had offered on several occasions prices different from the established GSA contract prices, which Schweizer determined were not listed in GSA contract

modifications. *Id.* ¶ 4. Schweizer obtained by email Wohlford's pre-sale pricing list, which contained different pricing than was reported to the government or listed in the GSA Advantage Program. Schweizer Dep. 272–74; Schweizer Decl. ¶ 5. Schweizer also found falsified documents that Océ's Contract Administrator, Kathleen Carey, had sent to the GSA. She reported this to Frost, who told her he "didn't want to talk about it" and "didn't want to hear about any documents that were falsified." Schweizer Dep. 156–59. In another conversation with Frost about "the corruption and the fraud in the company," Schweizer warned Frost of the risk of noncompliance with a GSA contract. Frost replied, "I know, that is one of the reasons why you're not to discuss these issues with anyone outside." Schweizer Dep. 270–71.

Schweizer's suspicions regarding Trade Agreements Act noncompliance developed from her review at Vice President Beauchamp's direction of Océ's Security and Exchange Commission (SEC) reports and product manufacturing information, Schweizer Dep. 228–31, and conversations with coworkers and Frost, Pl.'s Am. Interrog. Resp. No. 4, July 20, 2010, ECF No. 105-4. Schweizer's review revealed over three hundred products manufactured in China by Imagistics, a company that Océ was planning to acquire. Schweizer Dep. 233. Coworkers told Schweizer that Océ manufactured in China products that were listed on the GSA contract as being manufactured in the Netherlands. Pl.'s Am. Interrog. Resp. No. 4. Frost told Schweizer that Océ "had been manufacturing in China for years" and that if Schweizer continued to pursue these issues, Océ "would 'destroy' her." *Id.*

Schweizer decided that Océ's noncompliance constituted illegal fraud and a False Claims Act violation after speaking with Larry Allen, President of the Coalition for Government Procurement. Schweizer Dep. 245–46. Allen told Schweizer she "could go to jail" if she placed products manufactured in China on the GSA schedule. *Id.*

In early December 2005, Schweizer reported the Trade Agreements Act violations to Vice President Beauchamp, characterizing them as False Claims Act violations. Pl.'s Am. Interrog. Resp. No. 8. Beauchamp directed her to speak with Gerald Whelan, Océ's Human Resources Director. *Id.* Whelan then directed her to speak with Océ's in-house counsel, Dan Harper. *Id.* Harper directed her to speak with Océ's outside counsel, Kenneth Weckstein, who had more experience with government contracting. *Id.* In each conversation, Schweizer repeated her belief that Océ was violating the False Claims Act by misrepresenting where its products were manufactured. *Id.* On December 8, 2005, Frost notified Schweizer that she was suspended without pay. Defs.' Statement of Undisputed Material Facts ¶ 48, Sept. 1, 2010, ECF No. 103-2. Later that month, Schweizer received a termination letter dated December 15, 2005, ascribing her termination to unprofessional conduct and poor performance. Schweizer Dep. 300. The letter explains that Schweizer's employment was terminated because she "engaged in indecent conduct (repeated cursing and yelling at other employees) . . . refused to follow orders from [her] supervisor and acted insubordinately to [her] supervisor . . . [and] failed to maintain necessary standards of workmanship and productivity." Letter from B. Beauchamp 1–2, Dec. 15, 2005, ECF No. 103-15. The letter further lists as grounds for dismissal Schweizer's unfounded allegations "that fraud and crimes had been committed by Mr. Frost." *Id.*

A few months later, in April 2006, Schweizer filed a *qui tam* suit against Océ. Count I alleges that Océ misrepresented its pricing practices, thereby not complying with its GSA contracts' price reductions clauses and overcharging the GSA in violation of the False Claims Act, 31 U.S.C. § 3729(a)(1) and (2). Count II alleges that Océ violated § 3729(a)(1) and (2) by misrepresenting where Océ manufactured its products and thereby not complying with the contracts' Trade Agreements Act clauses. Count III alleges that Océ fired Schweizer in

retaliation for her fraud investigation, violating § 3730(h), the FCA's whistleblower protection provision. Pl.'s Compl., Apr. 7, 2006, ECF No. 1. In December 2006, Schweizer's coworker Nancy Vee joined Schweizer in filing an amended complaint, adding Vee as a plaintiff. In September 2009, the United States intervened in Counts I and II to request dismissal following execution of a settlement agreement between the United States, Océ, and plaintiff Vee. In January 2010, this Court granted the United States' Motion to Dismiss Counts I and II with prejudice, over Schweizer's opposition, leaving only Schweizer's Count III retaliation claim. This Court now rules on Océ's Motion for Summary Judgment on Count III and request for attorneys' fees and costs.

## II. LEGAL STANDARD

The Court will grant a motion for summary judgment where a party shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). There is a genuine issue as to a material fact if "reasonable minds could differ" as to that fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986), *cited in Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The burden is on the moving party to demonstrate that there is an "absence of a genuine issue of material fact" in dispute. *Celotex*, 477 U.S. at 323. The Court will believe the evidence of the non-moving party and will draw all reasonable inferences from the record in the non-moving party's favor. *Anderson*, 477 U.S at 255. In addition, "the court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." D.D.C. LCvR 7(h)(1). To avoid summary judgment, the non-moving party cannot merely raise "*some* alleged factual dispute": the fact at issue must be "material." *Id.* at 247 (emphasis in original). A material fact is one "that might affect the

outcome of the suit under the governing law." *Id.* at 248. Thus, summary judgment is appropriate only where the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252.

### III. DISCUSSION

#### A. The Court Will Grant Summary Judgment to Defendants.

##### 1. *The Elements of Retaliation Under the False Claims Act*

The False Claims Act (FCA) prohibits employers from retaliating against employees "because of lawful acts done by the employee . . . in furtherance of an action under this section, including investigation for, initiation of, testimony for, or assistance in an action filed or to be filed under this section." 31 U.S.C. § 3730(h)(1) (2006). Such retaliation includes being "discharged, demoted, suspended, harassed, or in any other manner discriminated against in the terms and conditions of employment." *Id.* An employee may bring an action to enforce this subsection. *Id.* § 3730(h)(2). As the D.C. Circuit has explained:

> [T]o prevail on a whistleblower claim, an employee must demonstrate that:
> (1) he engaged in protected activity, that is, "acts done . . . in furtherance of an action under this section"; and
> (2) he was discriminated against "because of" that activity. To establish the second element, the employee must in turn make two further showings. The employee must show that: (a) "the employer had knowledge the employee was engaged in protected activity"; and (b) "the retaliation was motivated, at least in part, by the employee's engaging in [that] protected activity."

*Hoyte* ex rel. *United States v. Am. Nat'l Red Cross*, 518 F.3d 61, 66 (D.C. Cir. 2008) (citations omitted).

With regard to the second element of a claim under § 3730(h)—that the employer has knowledge that the employee was engaged in protected activity—the D.C. Circuit has further explained that "[p]laintiffs alleging that performance of their normal job responsibilities

6

constitutes protected activity must overcome the presumption that they are merely acting in accordance with their employment obligations to put their employers on notice" that they are engaged in protected activity. *United States* ex rel. *Williams v. Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (citations omitted). In other words, to prevail here, plaintiff must establish that her internal reporting of Océ's alleged FCA violation was beyond the scope of her employment responsibilities and was sufficient to put Océ on notice that plaintiff was engaged in activity protected by statute.

### 2. *Analysis*

In this case, the evidence shows that Schweizer failed to put Océ on notice that she had gone beyond the scope of her employment duties and was engaged in activity protected under the False Claims Act. In *Martin-Baker*, the D.C. Circuit's leading opinion on the application of the second prong of the *Hoyte* standard, the plaintiff was the chief contracts negotiator of Martin-Baker Aircrafts. 389 F.3d at 1254. In this position, one of the plaintiff's central job responsibilities was to analyze pricing for products sold to the U.S. government. *Id.* at 1255. In fulfilling this role, the plaintiff alerted his supervisor and the government that Martin-Baker's pricing violated its government contracts (and therefore the FCA). *Id.* at 1261. After being terminated by Martin-Baker, the plaintiff brought suit alleging that his firing was in violation of the FCA's retaliation provision. *Id.* at 1255. On appeal, the D.C. Circuit concluded that when an employee's employment obligations include reporting potential fraud up the management chain, that report—without more—does not satisfy the notice requirement. *Id.* at 1261. On the facts of *Martin-Baker*, though, the Court concluded that the plaintiff did satisfy the notice requirement when he went beyond his employment obligations by reporting his findings to the government and advising the government to challenge Martin-Baker's pricing. *Id.* Here, though, the evidence

7

demonstrates that—unlike the plaintiff in *Martin-Baker*—Schweizer took no action that would have put Océ on notice that she was engaged in protected activity. Accordingly, summary judgment for defendants is required.

Schweizer was a Contracts Manager responsible for ensuring legal and contractual compliance. Schweizer Dep. 131, 171–72. In this capacity, every step she took in furtherance of her "fraud investigation" was an act that fell within her job description or was undertaken at senior management's express instruction. For example, when Schweizer initially began to investigate potential fraud at Océ by comparing Accounts Managers' pricing with pricing listed in the GSA contracts and the GSA Advantage Program, she was fulfilling her role in ensuring the company's compliance with the Schedules 36 and 70 GSA contracts. Job Description at 1–2; Schweizer Dep. 150–51. In addition, Schweizer's job description requires that she report any suspected pricing issues to her direct supervisor, Job Description at 7, which she did, Schweizer Dep. 156–58; Pl.'s Am. Interrog. Resp. No. 8. Furthermore, as Schweizer continued to report her concerns up Océ's chain of command, to human resources, in-house counsel, and outside counsel—at management's request—she acted solely within the context of her employment. Job Description at 7. At no time did she inform anyone at Océ that she was acting pursuant to the False Claims Act and or that she intended to file a claim under the Act unless the company moved to resolve her concerns.[1] Indeed, even when Schweizer shared her concerns about Océ's alleged FCA violations to a professional contact at an outside organization, the Coalition for Government Procurement, she was acting according to her job description, which required her to

---

[1] The Court is well aware that a plaintiff need not state explicitly to her employer or anyone else her intention to file a False Claims Act suit to put her employer on notice. *United States* ex rel. *Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998) ("Threatening to file a qui tam suit or to make a report to the government . . . clearly is one way to make an employer aware. But it is not the only way."). The Court merely mentions this to emphasize that Schweizer acted solely to perform her job responsibilities and not to make Océ aware that FCA litigation was a reasonable possibility.

"participate in Coalition for Government Procurement" to stay educated on government contract law. Job Description at 2. Tellingly, Schweizer's own pleadings characterized her purported investigation as an attempt to "bring the Océ GSA contracts into compliance." Pl.'s Am. Compl. ¶ 51, Dec. 22, 2006, ECF No. 10. In sum, Schweizer has failed to produce any evidence documenting that she acted outside her job description in any manner that should have put Océ on notice that she was acting in furtherance of an FCA suit.

Rather than point the Court to evidence establishing that Océ was on notice, Schweizer urges the Court to evaluate the notice requirement under the Fourth Circuit's formulation of the elements of a § 3730(h) claim rather than the D.C. Circuit's standard set forth in *Hoyte* and *Martin-Baker*. Pl.'s Opposition to Defs.' Motion for Summary Judgment 14–16, Sept. 20, 2010, ECF No. 105. In *Eberhardt v. Integrated Design & Constr., Inc.*, the Fourth Circuit held that "characterizing the employer's conduct as illegal or fraudulent or recommending that legal counsel become involved" is sufficient to constitute notice. 167 F.3d 861, 868–69 (4th Cir. 1999). Thus, Schweizer argues, under the *Eberhardt* construction,[2] her allegations of fraud to Frost, Beauchamp, Whelan, and Harper would constitute notice because she used the words "fraud" and "illegal" in addition to "noncompliant." Pl.'s Opposition to Defs.' Motion for Summary Judgment 15.

The Court declines plaintiff's invitation to broaden the scope of the notice requirement beyond the clear limits set forth by the D.C. Circuit. In *Martin-Baker*, the D.C. Circuit declined to extend whistleblower protection under the FCA to the extent set forth in *Eberhardt*, and instead joined the Sixth Circuit in holding that "where plaintiff was 'simply performing his ordinary duties' when he told employer that certifications were illegal and that other companies

---

[2] Schweizer does not argue she satisfies the "recommending that legal counsel become involved" trigger, likely because she did not instigate her meetings with Océ's in-house or outside counsel; Océ did.

had incurred FCA liability for similar acts," the employer was not on notice that plaintiff was engaged in protected acts. *Martin-Baker Aircraft Co.*, 389 F.3d 1251, 1261 (D.C. Cir. 2004) (quoting *Yuhasz v. Brush Wellman, Inc.*, 341 F.3d 559, 567 (6th Cir. 2003)). Indeed, the Sixth Circuit in *Yuhasz* squarely considered and rejected the authority on which the Fourth Circuit relied for its conclusion in *Eberhardt* that the words "illegal" and "fraudulent" carry a talismanic power to constitute notice under the FCA. 341 F.3d at 567 (citing *Robertson v. Bell Helicopter Textron, Inc.*, 32 F.3d 948, 952 (5th Cir. 1994)). The Sixth Circuit held that "[t]he mere fact that [plaintiff] told [his employer] that its certifications of compliance were 'unlawful and illegal' does not establish notice." *Id.* The Court here is bound by the D.C. Circuit's formulation of the notice requirement,[3] and holds that Schweizer has not presented sufficient evidence to establish a material dispute that Océ was on notice of any protected acts she had taken under the FCA when it terminated her.

In light of the conclusion that there is no reasonable dispute as to whether Océ was on notice of any protected activity in which Schweizer was engaged, the Court need not reach the question of whether Schweizer has satisfied *Hoyte*'s first prong by producing evidence that, in monitoring Océ's GSA contracts' compliance, she was engaged in acts in furtherance of an FCA action. Nor does the Court need to consider the issue of causation—whether Océ terminated Schweizer partly because of her protected activity—at this time.

---

[3] In addition to *Eberhardt*, plaintiff points the Court to an earlier D.C. Circuit case in which the Court of Appeals held that a whistleblower need not "report his allegations to the government--or to anyone outside of the employing institution" to be engaged in acts done in furtherance of an FCA action. *United States* ex rel *Yesudian* v. *Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998). The facts of *Yesudian* are distinguished from this case, *Eberhardt*, and *Martin-Baker*, because the plaintiff in *Yesudian* was not responsible for oversight or compliance. The Court here is thus bound by the Court of Appeals' most recent discussion of the notice requirement in *Martin-Baker*.

### B. The Court Will Deny Attorneys' Fees to Defendants.

The False Claims Act permits a Court to award reasonable attorneys' fees and expenses if "the Government does not proceed with the action and the person bringing the action conducts the action . . . the defendant prevails in the action and the court finds that the claim of the person bringing the action was clearly frivolous, clearly vexatious, or brought primarily for purposes of harassment." 31 U.S.C. § 3730(d)(4) (2006). "The award of fees under the False Claims Act is reserved for rare and special circumstances." *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1006–07 (9th Cir. 2002).

Schweizer's FCA claim is not "clearly frivolous," and defendants have not shown that it was brought "primarily for the purposes of harassment." Schweizer's interactions with coworkers and superiors and her discovery of pricing and manufacturing information while performing her job made it reasonable—though not correct—to believe that litigation would reveal evidence of fraud. Moreover, the United States did ultimately intervene in this case after it reached a settlement with Océ concerning Schweizer's allegations of fraud. Finally, Schweizer's reliance on the Fourth Circuit's notice standard in pursuit of her retaliation claim—though mistaken—does not constitute the sort of frivolity necessary to justify attorneys' fees and expenses.

### IV. CONCLUSION

For the reasons stated herein, the Court will GRANT defendants' Motion for Summary Judgment on Count III of plaintiff's Amended Complaint and will DENY defendants' request to award attorneys' fees and costs.

A separate Order consistent with this Memorandum Opinion shall issue this date.

Signed by Royce C. Lamberth, Chief Judge, on March 25, 2011.