# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES *ex rel.* Stephanie Schweizer *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil No. 06-648 (RCL) |
| OCÉ NORTH AMERICA, INC. *et al.*, | ) ) | |
| Defendants. | ) ) ) | |

## <u>MEMORANDUM OPINION</u>

Plaintiff Stephanie Schweizer was terminated after notifying supervisors about her company's violation of government contracts. She subsequently brought these allegations to the government, which ultimately reached a proposed settlement with the company—a settlement of which Ms. Schweizer would stand to receive a certain percentage. In this lawsuit, she challenges the settlement, and alleges that she was terminated in retaliation for her whistle-blowing. The case is before the Court on remand to determine whether the settlement is "fair, adequate, and reasonable" after a hearing pursuant to 31 U.S.C. § 3730(c)(2)(B), and to rule on "the ultimate question [of] 'whether a reasonable jury could infer . . . retaliation from all the evidence.'" *U.S. ex rel. Schweizer v. Océ N.V.*, 677 F.3d 1228, 1237, 1241 (D.C. Cir. 2012), *rev'g* 681 F. Supp. 2d 64 (D.D.C. 2010), *and rev'g* 772 F. Supp. 2d 174 (D.D.C. 2011). Because the Court finds the proposed settlement is "fair, adequate, and reasonable," the government's motion to dismiss Ms. Schweizer's *qui tam* claims, ECF No. 63, is GRANTED. Because a reasonable jury could infer that Ms. Schweizer's termination was retaliatory, defendants' supplemental motion for summary judgment, ECF No. 124, as to Ms. Schweizer's retaliation claim is DENIED.

## I.   BACKGROUND

### A.  Factual Background

In late 2004, plaintiff Stephanie Schweizer went to work for defendant Océ North America, a private company, supervising its fulfillment of certain government contracts. *U.S. ex rel. Schweizer*, 677 F.3d at 1229-30.   Contracts between Océ and the General Services Administration contained "price reduction" clauses, requiring Océ to provide government customers with the same discount offered to certain private sector purchasers. *Id.* at 1229 (citing 48 C.F.R. § 552.238–75).  These contracts also contained "country-of-origin" clauses, requiring Océ to sell to the government only goods made in the United States or other countries designated under the Trade Agreements Act, 19 U.S.C. § 2501 *et seq.  Schweizer*, 677 F.3d at 1229.

### 1.  Ms. Schweizer's Prima Facie Case of Retaliation

The Court of Appeals, reviewing the same record in the light most favorable to Ms. Schweizer (the non-movant), found that Ms. Schweizer had successfully set forth a prima facie case of retaliatory termination:

> In early 2005 Schweizer began to suspect that Océ was violating the price reduction clauses.  Through discussions with several co-workers, she learned that Océ representatives had been offering private sector customers significant ad hoc discounts.   Her further investigation revealed that Océ was not passing these discounts on to the government, as the price reduction clauses required.   If accurate, these findings meant that Océ regularly overcharged government agencies.
>         Schweizer sought to correct the violations, consistent with her duties as GSA contracts manager.  She provided [her immediate supervisor, Ronald] Frost with records documenting the private sector discounts, which she said were causing Océ "not to be in compliance with the [contracts]."   Frost allegedly responded by forbidding Schweizer from investigating the matter and stating that management would "destroy" her if she disobeyed.
>         A second set of concerns arose in November 2005 as Océ was planning to merge with Imagistics, a rival print and document management company.  In preparation for the merger, Océ officials asked Schweizer to determine whether Imagistics' products complied with the contracts' country-of-origin clauses. Schweizer replied that they did not.   She explained in an e-mail to Bryan

Beauchamp, Océ's vice president of business development, that most Imagistics products were manufactured in China, a country not certified under the Trade Agreements Act. Beauchamp agreed with Schweizer's assessment. Despite this understanding, Frost directed Schweizer to add Imagistics' products to Océ's government contract listings just a few days later. When Schweizer refused, Frost allegedly told her not to pursue the issue any further and again threatened to "destroy" her if she did not comply.

Schweizer did not heed Frost's warning. Instead, she contacted Beauchamp, Frost's superior, in early December 2005. Schweizer informed Beauchamp of Frost's actions, her pricing investigation, and her belief that Océ was violating the False Claims Act. She also alleged that many of Océ's own products were made in China, rather than in the Netherlands as stated in the contracts. Beauchamp referred Schweizer to Océ's human resources director, Gerald Whelan, who then directed her to meet with in-house counsel, Dan Harper. That meeting resulted in a further referral to Kenneth Weckstein, Océ's outside counsel for government contracting issues. In each of these conversations Schweizer reiterated her claim that Océ was violating the False Claims Act.

On December 6, 2005, Schweizer made a final, emotional plea to Beauchamp. She complained that the meetings with Whelan, Harper, and Weckstein were not productive, and that Beauchamp was "her last hope in terms of . . . saving the company" from "legal trouble." Beauchamp suspended Schweizer two days later, and terminated her employment on December 15. In a letter memorializing these actions, Beauchamp wrote that Schweizer had engaged in "inappropriate communications with [her] colleagues and supervisors"; "refused to follow orders"; ignored "the chain of command"; and "failed to maintain necessary standards of workmanship and productivity." The letter added that Océ would "continue to investigate" Schweizer's "numerous complaints . . . about illegal conduct," including "fraud and crimes" committed in conjunction with the company's "Federal Supply Schedule contract." It closed by stating

> While Océ's initial response to your allegations is that they are without basis, you may want to bring your concerns to the attention of the Inspector General at the U.S. General Services Administration ("GSA"). Separately, Océ intends to report your allegations to the GSA Inspector General.

*Schweizer*, 677 F.3d at 1230-31.

## 2. Océ's Alternative, Non-Discriminatory Basis For Termination

The Court of Appeals also found, based on the same record before this Court, that Océ had "presented an alternative, non-discriminatory basis for terminating her employment." *Id.* at 1241. Because the circuit did not describe this in detail, this opinion will review the evidence

regarding Ms. Schweizer's conduct in the months leading up to her termination that provides the defendant with an alternative, non-discriminatory basis for termination.

i.    Ms. Schweizer's Alleged Failure to Timely Complete Her Duties

In early 2005, Ms. Schweizer was tasked with facilitating the novation of a contract. Def.'s Statement of Undisputed Material Facts ¶ 10, ECF No. 124; Schweizer Dep., Ex. D, 176:2-6.  In August, Mr. Frost reprimanded Ms. Schweizer for failing to complete this task in a timely manner and reassigned it to her co-worker, Kathleen Carey.  Def.'s Statement ¶¶ 10-11; Pl.'s Resp. to Def.'s Statement ¶ 11; Schweizer Dep. 176:7-10 (acknowledging that Mr. Frost "repeatedly" asked her about the status of her completing the assignment.); *id.* at 201:1-14 (acknowledging that Mr. Frost communicated to her that she needed to process contract modifications in a more timely manner, and that if a contract modification couldn't be completed within 48 hours, she was to let him know so he would "know what was going on").

ii.    Ms. Schweizer's Unexcused Absence

Ms. Schweizer failed to report to work on Monday, October 10.  Mr. Frost e-mailed her to learn why she was absent.  Ms. Schweizer responded the next day, stating that she believed (mistakenly) that the company had been closed for a holiday.  Defs.' Statement ¶¶ 24-25; Pl.'s Resp. ¶¶ 24-25.  The Court takes judicial notice of the fact that October 10, 2005 was Columbus Day,   a   federal   holiday.   *See*   2005   Federal   Holidays, http://archive.opm.gov/Operating_Status_Schedules/fedhol/2005.asp  (last  accessed,  June  18, 2013).

iii.    Ms. Schweizer's Conflicts With Co-Workers

In the Spring of 2005, Ms. Schweizer complained to Mr. Frost on several occasions that her co-worker Kathleen Carey was "sabotaging her work."  Pl.'s Resp. ¶ 12; *see also* Def.'s

Statement ¶ 12. The parties dispute the nature of this complaint and how it was received. *Compare* Def.'s Statement ¶ 12 ("[I]n Spring 2005, approximately once per week, Schweizer began making vague allegations that other employees were sabotaging her work: yelling and using offensive language as she did so. In response to each report, Frost asked Schweizer to provide details or some evidence that her co-workers were taking the actions of which she accused them. Schweizer never provided that information."), *with* Pl.'s Resp. ¶ 12 (denying that Ms. Schweizer made such reports once per week or that she used offensive language or yelled; explaining that Ms. Carey wrongly altered some of Ms. Schweizer's completed work; and insisting that Ms. Schweizer provided specific evidence in support of her allegations to Mr. Frost on each occasion).

In April 2005, Ms. Schweizer had a discussion with Mr. Frost about her co-worker Lee Metzger and whether he had been "spreading rumors" about her. Pl.'s Resp. ¶ 14; *see also* Def.'s Statement ¶¶ 13-14. The parties disagree about the circumstances of this discussion. *Compare* Def.'s Statement ¶¶ 13-15 (stating that after Schweizer "went into Frost's office and announced her intent to lodge a formal complaint against Lee Metzger," whom she accused of "spreading rumors and speaking disparagingly about [her] to other employees," Frost "investigated the matter and could not find any support for Schweizer's allegations."), *with* Pl.'s Resp. ¶¶ 13-15 (stating that Schweizer was "called into Frost's office" where Frost and another co-worker informed her that Metzger was "spreading rumors about her" and "asked her to file a complaint" but that Schweizer "did not want to file a complaint").

In May 2005, Ms. Schweizer had a confrontation with her co-worker Kathleen Carey regarding alleged negative comments she had made about Ms. Schweizer's performance. Pl.'s Resp. ¶ 16; Def.'s Statement ¶ 16. During the confrontation, Ms. Carey called Mr. Frost. Pl.'s

Resp. ¶ 17; Def.'s Statement ¶ 17.  Ms. Schweizer later repeated this complaint about Ms. Carey to Mr. Frost, and further alleged that Ms. Carey had "entered into her office to modify documents affiliated with the GSA Schedule contracts."   Pl.'s Resp. ¶ 19.  On September 2, Ms. Schweizer had a "heated discussion" with Mr. Frost in his office in which she "raised [her] voice" while telling Mr. Frost that Ms. Carey "has falsified documents to the government" and that "[i]t was a very serious problem that he" did not "want to dwell on this."  Schweizer Dep. 162:4, 163:15-164:2, 170:3-4.  During the meeting, Mr. Frost told Ms. Schweizer that there were aspects of her performance that needed improvement, and that "he was not pleased."  Schweizer Dep. 199:2-11.  Following this meeting, Mr. Frost sent Ms. Schweizer home for the day and e-mailed her documenting the incident, stating:

> Your behavior . . . in my office this day is un . . . acceptable.  I have asked you on numerous occasions to move forward and lets get busy on our hard work at hand. You continue to come in my office to discuss the same issues. I do not . . . accept that behavior. If you can move forward and work on the task at hand please do so if not please let me know immediately. I asked you to leave the building and cool off. If you can['] t then you need to go home and think about it over the weekend. I will not continue to spend valuable time on the same issues.

Email re: Friday, Dated Sept. 2, 2005, 11:53 AM, from Ronald Frost to Stephanie Schweizer, Defs.' Ex. J, ECF No. 124-10; *see also* Schweizer Dep. at 162:17-163:4 (authenticating the document). The parties disagree regarding the other circumstances of these events.  *Compare* Def.'s Statement ¶¶ 16-21 (stating that Schweizer initially "verbally and physically confronted Carey"; that, when called by Ms. Carey, Mr. Frost confirmed that she had *not* denigrated Ms. Schweizer; that, after this call to Mr. Frost, Ms. Schweizer proceeded to "yell and curse" at Ms. Carey; that Ms. Schweizer subsequently complained to Mr. Frost that Ms. Carey had "falsif[ied] documents and br[oken] into [Ms.] Schweizer's office to destroy evidence of her undermining activities, and to take paper from her printer"; and that, in September, Ms. Schweizer "threw a

screaming tantrum in Frost's office" alleging that her co-workers were "sabotaging her work"), *with* Pl.'s Resp. ¶¶ 16-20 (stating that Ms. Carey provoked the confrontation by sending Ms. Schweizer "multiple emails suggesting that she was not doing her job"; that Ms. Schweizer "approached Carey and requested that she stop suggesting that Schweizer is not doing her job"; that, when Ms. Carey called Mr. Frost, he "*agreed* with Schweizer that Carey had made negative comments about Schweizer" (emphasis added); and that Ms. Schweizer never accused Ms. Carey of taking paper from her printer or breaking into her office).

In November, Ms. Schweizer had a conversation with her co-worker Lee Metzger after she had heard others making comments about "[Mr. Metzger's] comments about her." *See* Email Chain re: Tues. Nov 22nd Issues, between Stephanie Schweizer and Ronald Frost, Dated Nov. 23, 2005, Defs.' Ex. M, ECF. No. 124-13; *but see* Schweizer Dep. 316:3-317:8 (reviewing without confirming or denying the authenticity of the document, nor accuracy of the statements).  In a subsequent e-mail sent by Mr. Frost to Ms. Schweizer regarding this conversation, Mr. Frost wrote that Mr. Metzger had called him to complain that Ms. Schweizer had "initiated" a "confrontation" in his office; that he had "no idea what prompted this but again this has caused a riff [*sic*] in the office"; that the confrontation was "out of line"; that he had previously "cautioned and counseled" her on her "chain of command and also on not creating unwarranted issues in the office that have no basis," and that he had told her "on numerous occasions that if [she] ha[d] issues to bring them to [him]."  Defs.' Ex. M.   Ms. Schweizer explained her conversation with Mr. Metzger in her e-mail response to Mr. Frost, stating "I don't appreciate his behavior and un professionalism [*sic*]. . . . *I have a right to tell him to lay off and that is all I did.*"   *Id.* (emphasis added).

iv.     The Termination

Mr. Frost claims that he held a face-to-face meeting with Ms. Schweizer on November 29 during which he informed her that he was going to work with the human resources department to prepare a "letter of concern" to address Schweizer's "abusive conduct and poor work performance." Defs.' Statement ¶ 27.  Ms. Schweizer denies this meeting occurred.  Pls.' Resp. ¶ 27.  Two days later, Mr. Frost e-mailed Jerry Whelan, Director of Human Resources, with a draft letter (to be sent to Ms. Schweizer) listing several problems with her performance, and stating that if her performance did not improve "substantially within thirty days," her employment might be terminated.  E-mail re: draft of issues to write Stephanie up, from Ronald Frost to Jerry Whelan, dated Dec. 1, 2005, 12:17 PM, Defs.'s Ex. N, ECF No. 124-14.   A few days later, Ms. Schweizer called Bryan Beauchamp, Mr. Frost's supervisor.  Defs.' Statement ¶¶ 35-38.  Ms. Schweizer later acknowledged that she was "utterly distraught" and "absolutely devastated" when she made the call, and that she had "probably had a glass or two of wine." Schweizer Dep. 280:20-21, 281:1-2; *see also id.* at 280:3-8 ("Q: Were you drunk? A: I wouldn't say that. I was utterly, utterly devastated. Q: You say you wouldn't say that. Were you impaired? A: I was impaired by my devastation.").  Ms. Schweizer discussed the alleged violations of the GSA contract, and complained to Mr. Beauchamp that "they were going to fire [her] and . . . that they were going to try to destroy [her], as Mr. Frost said they were going to do."  Schweizer Dep. 281:10-13; Def.'s Statement ¶ 37.  Otherwise, the parties sharply disagree about the subject of the conversation.  *Compare* Defs.' Statement ¶¶ 35-38 (stating that Ms. Schweizer called Beauchamp "as her last hope"; that Beauchamp believed that she was inebriated or "not in a clear mental state"; that she accused Mr. Frost of carrying on an affair with a former employee; that she told him that her co-workers "were saying that Beauchamp was a racist"; and that she

8

referred to "people that you can't see but talk to you"), *with* Pl.'s Resp. ¶ 36-38 (stating that Ms. Schweizer informed Beauchamp "of the detailed allegations of fraud that she made to Océ's outside counsel," and disputing the remainder of Mr. Beauchamp's testimony regarding the conversation as "self-serving").

A few days later, Schweizer was suspended with pay. *See* Letter from Bryan Beauchamp to Stephanie Schweizer, Dated Dec. 15, 2005, Def.'s Ex. P, ECF No. 124-14; Schweizer Dep. 286:9-12. A week later, Mr. Beauchamp sent a letter to Ms. Schweizer terminating her employment. Def.'s Ex. P. The letter noted that Ms. Schweizer was an employee at will, and thus could be terminated for "any reason or no reason, consistent with public policy." Def.'s Ex. P. Nonetheless, the letter summarized the events described above,[1] and then stated which of Océ's Standards of Conduct Ms. Schweizer allegedly violated:

> Among other things, you have engaged in indecent conduct (repeated cursing and yelling at other employees). You have refused to follow orders from your supervisor and acted insubordinately to your supervisor. And you have failed to maintain necessary standards of workmanship and productivity. . . .

Defs.' Ex. P.

---

[1] The letter summarizes those events as follows:

> On Tuesday, December 6, 2005, you called me and we spoke for more than 30 minutes. During that call you were incoherent and you cursed repeatedly. Based on this unprofessional conduct, I took action to suspend you with pay until a decision was made about whether further action was necessary. . . .
> Your call . . . was not the first time that you acted unprofessionally . . . . On several occasions since at least April 2005, you have been counseled about inappropriate communications with your colleagues and supervisions. Despite the counseling and warnings, the complaints about your behavior have continued. In September, you screamed and cursed at Ron Frost in the office. On several occasions you screamed and cursed at Kathy Carey. These incidents were witnessed by other employees. After the September incident with Mr. Frost, he sent you home for the day. He also sent you an email on September 2, 2005, noting that unprofessional conduct would not be tolerated. You received another warning after your enraged and unprofessional confrontation with Lee Metzger on November 22, 2005. Your subsequent outburst with me indicates that you did not take seriously Mr. Frost's prior admonitions.

Defs.' Ex. P.

    v.    <u>Océ's Disclosure to GSA</u>

On the same day Mr. Beauchamp sent the termination letter to Ms. Schweizer, Océ's corporate counsel sent the Inspector General of the GSA a letter notifying them that Ms. Schweizer had reported "wrongdoing" regarding two contracts, but insisting that there was "no reason to believe that there has been any wrongdoing regarding" those contracts.  Letter from Scott R. Hawthorn to Brian D. Miller, Dec. 15, 2005, Defs.' Ex. Q, ECF No. 124-17.

    vi.    <u>Océ's Employee Discipline and Termination Policy</u>

Océ's Human applicable Resources Policy provides that:

> [U]nless the conduct in question is extreme, an individual's employment is not to be terminated before he/she is given a chance to correct the behavior. . . .
> If, however, after investigating considering the circumstances, the Company determines that the conduct in question is condemnable, then the individual's employment is terminated without being given a chance to correct the behavior. . . .
> While the severity of the conduct and other relevant considerations may result in an escalation of the process, *normally the initial appropriate corrective is either a verbal or written reprimand.*  If there is a reoccurrence of the conduct, the Company escalates the corrective action to the next level.

Human Resources Policy #5.2, Effective Date 12/1/03, Def.'s Ex. G, ECF No. 124-7.  The Addendum to this policy further provides:

> [A]ny act which causes, or might cause harm to the Company or its employees, or which interferes with the rights or property interests of the Company or its employees, may subject the offender to disciplinary action which may include discharge, depending on the severity of the infraction.
> The following list is not meant to be all-inclusive, but it contains examples which experience has shown violate the general principles stated above. . . .
>    . . .
>    2. Fighting, assault, threatening or causing bodily injury to others.
>    3. Criminal, immoral, or indecent conduct.
>    4. Refusal to accept or follow orders from proper authority, or any other form of insubordination, such as cursing a supervisor.
>    . . .
>    10. Careless or inefficient performance of duties, including failure to maintain standards of workmanship or productivity.
>    . . .

13. Excessive absence or tardiness, failure to report to work without a satisfactory reason, or failure to report absence or tardiness.
. . .
17. Sexual or abusive harassment of fellow employees.

*Id.*

## B.  Procedural Background

Schweizer filed a three-count complaint against Océ in April 2006. The first two counts rely on the False Claims Act's *qui tam* provisions, which permit private citizen "relators" to sue on behalf of the United States. . . . The third count states a claim for retaliation under [the same statute], which prohibits employers from discriminating against an employee "because of lawful acts done by the employee . . . in furtherance of an action under this section." . . . . Specifically, Count III asserts that Océ fired Schweizer as a result of her pricing and product sourcing investigations.  Schweizer filed an amended complaint in December 2006, which added Océ employee Nancy Vee as a co-plaintiff on Counts I and II.

The government declined to intervene in the case after conducting an extensive investigation of Schweizer's *qui tam* claims. . . . Nonetheless, it remained an active participant in settlement discussions. These talks came to fruition in September 2009, when Océ, Vee, and the government—but not Schweizer—reached an agreement to dispose of Counts I and II.  The agreement required Océ to pay $1.2 million, plus interest, to the government, with nineteen percent of that total set aside for Schweizer and Vee. [*See* Settlement Agreement 3, ECF No. 68-1.]  In return, Océ received a partial release from liability and a promise that the government would move to dismiss Counts I and II of the amended complaint. [*Id.*] The government filed its notice of intervention and corresponding motion to dismiss on September 8, 2009. [ECF Nos. 63 & 64.]

*Schweizer*, 677 F.3d at 1231-32 (some internal quotations and citations omitted).  The settlement

agreement further provides that the allocation of the nineteen percent between Ms. Schweizer

and Ms. Vee shall be determined by this Court.  *See* Settlement Agreement 3, ECF No. 68-1.  At

the hearing conducted on July 10, 2013, the Court learned that the settlement has already been

paid, and an allocation between the two plaintiffs has already been made.

This Court dismissed Counts I and II without evaluating the proposed settlement, finding

that "the government has an unfettered right to dismiss' a qui tam suit," *U.S. ex rel. Schweizer v.*

*Océ, N.V.*, 681 F. Supp. 2d 64, 65 (D.D.C. 2010) (quoting *Hoyte v. Am. Nat'l Red Cross*, 518

F.3d 61, 65 (D.C. Cir. 2008), and granted Océ's motion for summary judgment on Count III, finding that Ms. Schweizer had failed to engage in any protected activity upon which a retaliation claim might have been built.  *U.S. ex rel. Schweizer v. Océ N. Am., Inc.*, 772 F. Supp. 2d 174 (D.D.C. 2011).

The Court of Appeals reversed on all counts.  *Schweizer*, 677 F.3d 1228.  The circuit held that it was error to dismiss the qui tam claims without determining whether the proposed settlement agreement was "fair, adequate, and reasonable" after a hearing pursuant to 31 U.S.C. § 3730(c)(2)(B).  *Schweizer*, 677 F.3d at 1237.  And, the circuit held that Ms. Schweizer had successfully stated a prima facie retaliation claim, and that Océ had presented "an alternative, non-discriminatory basis for terminating her employment," leaving only "the ultimate question whether a reasonable jury could infer retaliation from all the evidence."  *Id.* at 1241 (internal modifications and quotations omitted).

A hearing on the proposed settlement pursuant to 31 U.S.C. § 3730(c)(2)(B) was conducted on July 1, 2013.   A hearing on the retaliation claim was conducted on July 10, 2013.

## II.   LEGAL STANDARD

### A.  31 U.S.C. § 3730(c)(2)(B) (False Claims Act Settlement Approval)

Subsection 3730(c)(2)(B) of Title 31 of the U.S. Code provides that the government may settle a false claims action with the defendant "notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances."   The determination of whether a False Claims Act settlement is "fair, adequate, and reasonable under all the circumstances" is apparently one of first impression in this circuit.   Other courts have looked for guidance to principles governing judicial review of class action settlements under the Federal Rules of Civil

Procedure, which provide that if a settlement proposal "would bind class members, the court may approve it only after a hearing and on finding that it is *fair, reasonable, and adequate*."  Fed. R. Civ. P. 23(e)(2) (emphasis added); *see U.S. ex rel. Nudelman v. Int'l Rehab. Associates, Inc.,* 00-cv-1837, 2004 WL 1091032, at *1 n.1 (E.D. Pa. May 14, 2004) (finding, as a matter of first impression, that since Congress borrowed the key language of 31 U.S.C. § 3730(c)(2)(B) from the rule governing judicial review of class action settlements, courts evaluating proposed False Claims Act settlements should apply the same factors they use in evaluating proposed class action settlements); *see also U.S. ex rel. Resnick v. Weill Med. Coll. of Cornell Univ.*, 04-cv-3088, 2009 WL 637137, at *2 (S.D.N.Y. Mar. 5, 2009) (following the *Nudelman* approach).  At the July 1, 2013 hearing, both parties urged the Court to adopt this approach.  The Court will do so.

While there is "no single test" for class action settlement approval under Rule 23(e) in this jurisdiction, courts look to the following factors: "(a) whether the settlement is the result of arm's length negotiations; (b) the terms of the settlement in relation to the strengths of plaintiffs' case; (c) the status of the litigation proceedings at the time of settlement; (d) the reaction of the class [here, of the relator]; and (e) the opinion of experienced counsel."  *In re LivingSocial Mktg. & Sales Practice Litig.*, 11-cv-0745, 2013 WL 1181489, at *7 (D.D.C. Mar. 22, 2013) (Huvelle, J.) (citing *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 375 (D.D.C. 2002) (Hogan, C.J.) (collecting cases)).

Ms. Schweizer's counsel raised one important additional issue regarding 31 U.S.C. § 3730(c)(2)(B) at the July 1, 2013 hearing that is also apparently of first impression in this circuit. Is a plaintiff-relator who objects a proposed False Claims Act settlement reached between the government and the defendant entitled to full-blown discovery on her claims in order to prove

that the settlement in inadequate?  The provision requiring the hearing provides no such right on its face, *see* § 3730(c)(2)(B) ("The Government may settle the action with the defendant notwithstanding the objections of the person initiating the action if the court determines, after a hearing, that the proposed settlement is fair, adequate, and reasonable under all the circumstances.").  Moreover, allowing full-blown discovery as of right would risk transforming the § 3730(c)(2)(B) hearing into a trial on the merits of plaintiff's claims and the government's estimations of the litigation risks.  It would put the cart before the horse, in essence making trial a precondition of settlement.   Given both the lack of textual support for discovery rights at this stage and the difficulties posed by imposing these costs the Court declines to read such a right into the statute.

The hearing guaranteed to plaintiff-relators under § 3730(c)(2)(B) does not give them the right to try their cases on the merits prior to settlement.  Rather, it serves a more limited purpose of forcing the government to provide some reasoning behind its decision to settle the case and giving the plaintiff-relators an opportunity to direct the court's attention to facts or allegations that would suggest the settlement was not "fair, adequate and reasonable under all the circumstances," for instance, collusion between the government and the defendant, or significant and unexplained discrepancies between the strength of plaintiffs' case and the settlement.

The Court does not decide here that discovery is *never* warranted at this stage of proceedings, only that a plaintiff-relator is not entitled to full-blown discovery at this stage *as of right*.  A court may, for example, determine that the government has not adequately explained its

reasoning behind the settlement, and may order some limited discovery prior to a § 3730(c)(2)(B) hearing.[2]  *See, e.g.*, *Nudelman,* 2004 WL 1091032, at *1 n.1.

**B.  Summary Judgment**

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  A fact is material if it could affect the outcome of the case.  *Id.*  A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  The non-movant, however, must establish more than "the existence of a scintilla of evidence" in support of his position.  *Id*. at 252.

**C.  31 U.S.C. § 3730(h) (False Claims Act Retaliation)**

At the time Ms. Schweizer's claim accrued, 31 U.S.C. § 3730(h) provided that "[a]ny employee who is discharged . . . by . . . her employer because of lawful acts done by the employee . . . in furtherance of an action under this section . . .  shall be entitled to all relief necessary to make the employee whole."  31 U.S.C. § 3730(h) (2006).  "This language states two basic elements: (1) acts by the employee 'in furtherance of' a suit under § 3730—acts also known as 'protected activity'; and (2) retaliation by the employer against the employee 'because of' those acts."  *Schweizer*, 677 F.3d at 1237 (quoting *United States ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 736 (D.C. Cir. 1998)).   The Court of Appeals has further divided the second element into two prongs: "(1) did 'the employer have knowledge the employee was engaged in protected activity'; and (2) was the employer's adverse action against the employee

---

[2] Notably, at the July 1, 2013 hearing, plaintiff-relator's counsel conceded that their predecessors as relator's counsel had full access to a vast array of documents from the government and defendant at the time the settlement was reached.

'motivated, at least in part, by the employee's engaging in that protected activity.'" *Id.* (quoting *Yesudian*, 153 F.3d at 736) (alterations omitted).

The *McDonnell Douglas* burden-shifting framework governs § 3730(h) retaliation claims. *Id.* at 1240-41 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Thus, the plaintiff must first state a prima facie case of retaliation by showing "(1) that [s]he engaged in statutorily protected activity; (2) that [s]he suffered a materially adverse action by his employer; and (3) that a causal link connects the two." *Id.* at 1240 (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)). If she does so, "the burden shifts to the employer to 'produce admissible evidence that, if believed, would establish that [its] action was motivated by a legitimate, nondiscriminatory reason.'" *Id.* at 1240-41 (quoting *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)). "Once that occurs, 'the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence.'" *Id.* at 1241 (quoting *Carter*, 387 F.3d at 878).

There is some confusion as to the nature of the causation requirement for this type of retaliation claim. May a plaintiff succeed by showing that retaliation was merely one of several "motivating factors" behind the adverse action? Or must she show that retaliation was a "but-for" cause of the adverse action? The circuit has endorsed the mixed-motive interpretation, finding that the plaintiff may succeed by showing that the adverse action was "motivated, *at least in part,* by the employee's engaging in that protected activity." *Schweizer*, 677 F.3d at 1237 (emphasis added). Notably, this interpretation rests on the Senate Report, not the text of the statute. *See id.* (quoting *Yesudian*, 153 F.3d at 736 (quoting S. Rep. No. 99–345, at 35, reprinted in 1986 U.S.C.C.A.N. at 5300)); *see also Fanslow v. Chicago Mfg. Ctr., Inc.,* 384 F.3d 469, 485

(7th Cir. 2004) (endorsing the mixed-motive standard for this provision); *Norbeck v. Basin Elec. Power Co-op.*, 215 F.3d 848, 851 (8th Cir. 2000) (same).

The Supreme Court's more recent text-driven interpretation of Title VII's antiretaliation provision casts doubt on this reading. *See Univ. of Tex. Sw. Med. Ctr. V. Nassar*, No. 12-484, slip op. (June 24, 2013). The provision at issue in *Nassar* prohibits employers from discriminating against employees "*because*" they engaged in protected activities under that statute.[3] *See* 42 U.S.C. § 2000e-3 (emphasis added). The Court concluded that this language precluded mixed-motive retaliation claims, relying in part on its interpretation of a similarly worded provision in the Age Discrimination in Employment Act (ADEA). *Nassar*, No. 12-484, slip op. at 9-13 (discussing *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009)). In the ADEA case, the Court interpreted 29 U.S.C. § 623(a), which makes it unlawful for an employer to take adverse action against an employee "*because of* such individual's age," and concluded that the plain meaning of that statute precluded mixed-motive claims, and meant that plaintiff had the burden to establish that age was the "but-for" cause of the employer's adverse action. *Gross*, 557 U.S. at 176; *see also id.* at 179 ("[T]he ADEA must be 'read . . . the way Congress wrote it.'" (quoting *Meachum v. Knolls Atomic Power Laboratory,* 554 U.S. 84, 102 (2008))). The Court in *Nassar* closely followed the textualist reasoning of its opinion in *Gross*: "[g]iven the lack of any meaningful textual difference between the text in this statute and the one in

---

[3] The provision provides in full:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3.

*Gross*, the proper conclusion here, as in *Gross*, is that Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Nassar*, slip op. at 11-12; *see also id.* at 20 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . . [which] requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer.").

The combined lesson of *Nassar* and *Gross* is clear: where Congress has given plaintiffs the right to sue employers for adverse actions taken against them by their employers "because of" X, plaintiffs may succeed only by showing that X was a "but-for" cause of the adverse action, not merely one of several "motivating factors."  Notwithstanding the circuit's statements to the contrary in this case, because the False Claims Act's retaliation provision includes the same key language as the Title VII retaliation provision recently interpreted by the Supreme Court in *Nassar*, and the ADEA discrimination provision interpreted in *Gross*, the Court must apply the same heightened causation standard here.  To succeed on her claim, a plaintiff must show that retaliation for protected activities was a "but-for" cause of the adverse action.[4]

## III.   ANALYSIS

Ms. Schweizer's *qui tam* claims (Counts I & II) are dismissed. Her retaliation claim (Count III) survives.

### A. Ms. Schweizer's *Qui Tam* Claims Are Dismissed Because The Government's Proposed Settlement is "Fair, Adequate, and Reasonable"

At the section 3730(c)(2)(B) hearing conducted on July 1, Ms. Schweizer had the opportunity to present arguments to support her contention that the proposed settlement was not "fair, adequate, and reasonable."  The Court was not convinced by these arguments.  It now

---

[4] At the hearing conducted on July 10, 2013 plaintiff's counsel conceded this point.

approves the proposed settlement, and dismisses Ms. Schweizer's *qui tam* claims.  As noted above (and as conceded by both parties during the July 1, 2013 hearing), the Court bases its conclusion on an evaluation of the proposed settlement under the five factors used by courts in this Circuit to evaluate class action settlements.

### 1.  Arm's Length Negotiations

A "presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's length negotiations between experienced, capable counsel after meaningful discovery." *In re Vitamins Antitrust Litig.*, 305 F. Supp. 2d 100, 104 (D.D.C. 2004) (Hogan, C.J.) (quotations and citations omitted).  The same is true of arm's length negotiations between the government and a defendant of potential qui tam claims.

In this case, there is no evidence in the record regarding the nature of bargaining between the government and Océ regarding the terms of the settlement.  That said, Ms. Schweizer does not allege any collusion, and concedes that the settlement was reached after a very extensive investigation by the government.  Accordingly, this factor supports approval of the settlement.

### 2.  Terms of the Settlement in Relation to the Strengths of Plaintiffs' Case

The benefits to the relators must be "considered in juxtaposition with the risks attendant to continued litigation of this matter."  *In re LivingSocial Mktg.*, 2013 WL 1181489, at *9 (citing *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 377 (D.D.C. 2002) (Hogan, C.J.)).

In a sealed filing, United States' Resp. to Relator Schweizer's Objection, ECF No. 72, and in open court at the July 1, 2013 hearing, the government provided an extensive and detailed account of its decision to settle the case and of its calculations of the ultimate settlement.  The government conducted an extensive investigation into these claims, employing GSA auditors,

attorneys from the U.S. Attorney's Office and from the Commercial Litigation Section of the Department of Justice.  The government collected over 80 boxes of internal Océ documents, conducted numerous interviews, performed audits, and issued an inspector general subpoena. Using this information it had gathered, the government assessed the value of claims, assessed a variety of litigation risks specific to each claim, and came up with a figure for a settlement. Specifically, the government determined that it might be able to prevail on some of the pricing claims, but would not likely prevail on the TAA claims.  Under the TAA claims, the government found that Océ had documentation showing the company had taken significant (and costly) steps to ensure TAA compliance, and that had received an advisory opinion from U.S. Cusoms and Border Protection that would undermine the government's claims.  The government also noted, at the July 1 hearing, that at the time of settlement, TAA claims were a developing area of the law, and the government was eager to avoid bringing close or difficult cases to litigation that might risk making "bad law" for them.  Under the pricing claims, the government found that these might be meritorious, but that the  two GSA contracting officers who would be trial witnesses provided testimony that would undermine the claims significantly.   The government assembled theses assessments and came up with a settlement figure equal to a little more than single damages on the claims the government believed it might be able to prevail on at trial.

At the July 1 hearing, and in a sealed memorandum, Relator's Reply to DOJ Resp., ECF No. 78, Ms. Schweizer disputed the government's judgments of the strength of her claims, and the risks of litigation.  She seemed to suggest that, if allowed to proceed to trial, she would *certainly* prevail on *all* of her claims and that any discount of the full damages she would be entitled to.

The Court does not have enough information to make a *complete* assessment of the merits of plaintiff's claims, or of the government's assessment of those claims—but it need not do so in order to find this factor weighs in favor of approving the settlement.  It finds that the government's assessments of the strength of plaintiff's claims and the attendant litigation risks are based on a significant investigative effort on their part, are sufficiently detailed and comprehensive, and that Ms. Schweizer's arguments fail to identify any significant flaw in the government's reasoning.  Accordingly, the Court finds that this factor weighs in favor of the settlement.

### 3.   The Status of the Litigation Proceedings at the Time of Settlement

Courts also "consider whether counsel had sufficient information, through adequate discovery, to reasonably assess the risks of litigation vis-a-vis the probability of success and range of recovery." *In re LivingSocial Mktg.*, 2013 WL 1181489, *9 (quoting *Cohen v. Chilcott*, 522 F. Supp. 2d 105, 117 (D.D.C. 2007) (quoting *In re Lorazepam & Clorazepate Antitrust Litig.*, MDL 1290, 2003 WL 22037741, *4 (D.D.C. June 16, 2003) (Hogan, C.J.))).

In this case, the government's proposed settlement was made after an extensive investigation into Ms. Schweizer's claims, conducted by GSA auditors and attorneys from the U.S. Attorney's Office and from the Commercial Litigation Section of the Department of Justice, involving extensive document review, as well as interviews with a variety of potential witnesses. Accordingly, the government had adequate information to make an informed judgment regarding the settlement.  The Court finds this factor weighs in favor of the settlement.

### 4.   The Reaction of the Relator

This factor is less useful in the context of a proposed *qui tam* settlement, where an objecting relator is a necessary predicate to this very analysis, than in the context of a proposed

class action settlement, where the number of objections filed by class members may vary considerably.  Nonetheless, the Court notes that, of the two relators, one has objected, and one has consented to the settlement.  Accordingly, this factor is in equipoise.

### 5.  The Opinion of Experienced Counsel

Finally, Courts in this jurisdiction have noted that "[t]he opinion of experienced counsel 'should be afforded substantial consideration by a court in evaluating the reasonableness of a proposed settlement.'"  *In re LivingSocial Mktg.*, 2013 WL 1181489, *10 (quoting *Meijer, Inc. v. Warner Chilcott Holdings Co. III*, 565 F.Supp.2d 49, 58 (D.D.C. 2008) (quoting *Lorazepam*, 2003 WL 22037741, at *6)).  In this case, this factor does not weigh in either direction.

***

Weighing all five factors together, the Court finds that they tilt in favor of finding the settlement was fair, adequate and reasonable.  Accordingly, the Court will approve the settlement, and grant the government's motion to dismiss the case.

### B.  Ms. Schweizer's Retaliation Claim Survives Summary Judgment

On Ms. Schweizer's retaliation claim, the Court must only decide "the ultimate question whether a reasonable jury could infer retaliation from all the evidence."  *Schweizer,* 677 F.3d at 1241.  The issue is whether there is a genuine issue of material fact as to whether retaliation was a "but-for" cause of Océ's decision to terminate Ms. Schweizer.

Over the course of 2005, Ms. Schweizer found and reported violations of federal contracts by her employer, ultimately leading to the $1.2 million settlement reached between the government and Océ, approved today.  In the same period, she also engaged in a variety of questionable and perhaps unprofessional conduct.

As the circuit found, Ms. Schweizer's asserted link between her protected activity and her termination is supported by direct as well as circumstantial evidence.  Circumstantially, her protected activities occurred in close temporal proximity to her termination and ultimately led to her employer paying a very substantial settlement. More directly, Ms. Schweizer alleges that her supervisor, Mr. Frost, attempted to stifle her protected activities by making threatening statements. After Ms. Schweizer brought violations to Mr. Frost, he allegedly "forb[ade] [her] from investigating the matter and stat[ed] that management would 'destroy' her if she disobeyed." *Schweizer*, 677 F.3d at 1230.  And later, when she raised concerns about another set of violations, Mr. Frost "allegedly told her not to pursue the issue any further and again threatened to 'destroy' her if she did not comply." *Id.*

In response, Océ's evidence documents Ms. Schweizer's erratic behavior over the same period, and shows that they may well have had a good reason to discipline, or even terminate, Ms. Schweizer.  However, this evidence cannot eliminate any genuine issue of material fact as to whether Océ's desire to retaliate against Ms. Schweizer for her protected activities was a "but-for" cause of her termination.  Notably, several of the events Océ points to as evidence of Ms. Schweizer's behavioral problems triggering her legitimate dismissal *itself* include whistleblowing activities.  Océ concedes that Ms. Schweizer discussed the allegations regarding the GSA contracts during her phone conversation with Mr. Beauchamp in the days immediately before her suspension. Def.'s Statement ¶ 37.  And, according to Ms. Schweizer's account of her "heated discussion" with Mr. Frost on September 2, she complained that her coworker Ms. Carey had "falsified documents to the government." *See* Schweizer Dep. 163:17-18.  It may be the case that the whistleblowing aspect of these conversations were insignificant, and that her termination would have occurred without the potentially (and ultimately successful) costly

allegations against Océ that she raised.  However, that is a determination for the jury, not this Court.

On this record, Ms. Schweizer's claim survives summary judgment.  A reasonable jury could make infer that retaliation was a "but-for" cause of her termination.  Océ's motion for summary judgment is DENIED.

## IV.      CONCLUSION

The government's motion to dismiss the *qui tam* claims is GRANTED.   Océ's supplemental motion for summary judgment as to the retaliation claim is DENIED.  An Order shall issue with this opinion.

Signed by Royce C. Lamberth, Chief Judge, on July 19, 2013.